AO 106 (Rev. 04/10) Application for a Search Warrant

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

APR 0 6 2017

JULIA C. DUDLEY, CLERK
BY: /s/ K. Dotyn
DEPUTY CLERK


SEALED

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 5:17mj00007
)
116 Forrest Drive )
Winchester, VA 22603 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

116 Forrest Drive, Winchester, VA 22603

located in the _____ Western _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 and 846 | possession with intent to distribute controlled substances; conspiracy to distribute controlled substances |

The application is based on these facts:
See Affidavit in support of Appliciation for Search Warrant.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Received by reliable electronic means and sworn and attested to by telephone.
~~Sworn to before me and signed in my presence.~~

Asia Webb, Special Agent, DEA
*Printed name and title*

Date: 4/6/17

*Judge's signature*

City and state: Harrisonburg, VA

Joel C. Hoppe, United States Magistrat Judge
*Printed name and title*



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR THE SEARCH OF 116 FORREST DRIVE WINCHESTER, VA 22603 | ) ) ) ) ) ) )    <u>UNDER SEAL</u>   5:17mj00007 |

### AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Asia Webb, a Special Agent ("SA") with the Drug Enforcement Agency ("DEA"), being duly sworn, deposes, and states that upon information and belief, there is probable cause to believe that the residence located at 116 Forrest Drive, Winchester, Virginia 22603 ("Forrest Drive Address"), which is further described in attachment A, contains evidence of crimes associated with the possession and distribution of controlled substances, to include methamphetamine, a Schedule 1 controlled substance, also known as meth, in violation of 21 U.S.C. §§ 841 and 846. Your affiant further states that there is probable cause to believe that a search and seizure of the items listed in attachments B will lead to evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those and related crimes.

The source of your affiant's information and the grounds for his belief are as follows:

1.    I have been an SA with the DEA for seven years, and I am the case agent on this case. I have extensive experience in narcotics investigations and investigative techniques. As the case agent, I am familiar with the facts of the case. Some of the facts related to this case I have learned from other law enforcement officers and witnesses involved in this investigation. I have not included in this affidavit all of the facts from this investigation because this affidavit is

drafted simply for the purpose of establishing probable cause to search the residence at the Forest Drive Address.

2. On April 4, 2017, at approximately 5:12 p.m., detectives and officers of the Metro Washington Airport Authority (MWAA) received a phone call from the Security Manager at Enterprise Rental Cars (EAN Holdings) in reference to a person named Mathew Berg (hereafter "Berg"). State law enforcement officials had recently charged Berg with a theft crime in relation to a vehicle Berg had rented from Enterprise Rental Car and not returned by the due date. The Security Manager informed the officers that Berg was at the rental car facility at Reagan National Airport, located at 1 Aviation Circle in Arlington, Virginia. The Security Manager informed the responding detectives that Berg should have an arrest warrant, and that Berg was at the rental counter attempting to obtain another rental car.

3. As detectives and officers were en route to Enterprise Rental Car at Reagan National Airport, the Security Manager further relayed to the law enforcement officers that Berg was with another person identified as Christopher Kain (hereafter "Kain"). The Security Manager explained that Kain was also in possession of one of Enterprise Rental Car's rental vehicles that was past due. Kain's rental vehicle was identified as a silver Chrysler 300, bearing Maryland license plate 8CT8002, with Vehicle Identification Number 2C3CCAKG3HH565410 (hereafter "Chrysler 300"). Kain had leased the Chrysler 300 from Enterprise, and had provided an address on the lease agreement of 116 Forrest Drive, Winchester, Virginia 23513 (the Forrest Drive Address). The Security Manager asked the officers to seize the Chrysler 300 to ensure its return to Enterprise.

4. Upon arrival at the rental car area, detectives learned that officers at Reagan National Airport had arrested Berg for the active felony theft warrant and had transported Berg to another location. However, during the search incident to arrest of Berg, officers found on Berg's person the keys for the overdue Chrysler 300 rented by Kain. Kain was still at the rental car location, and agreed to help detectives and officers locate the Chrysler 300. Detectives, officers and Kain walked through the rental car garage looking for the Chrysler 300, while utilizing the key fob panic button in an attempt to sound the audible alarm and locate the vehicle.

5. Detectives and officers explained that Kain continued to walk around the rental car garage, voluntarily, looking for the Chrysler 300, but could not locate it. Det. Dower asked Kain if he was sure of the Chrysler 300's location. Kain stated that Berg had driven the vehicle with Kain from Winchester to the Reagan National Airport, and that Kain was unsure of the exact location of the Chrysler 300. However, Kain confirmed that he was positive the Chrysler 300 was parked somewhere in the rental car garage (Garage A), and that he and Berg had not driven up or down to any other levels of the garage after entry. Det. Dower asked Kain if he lived in Winchester (Winchester, Virginia) and Kain stated that he did. Kain also said that Berg lived "nearby" him in Winchester. Detectives explained that Kain continued to circle the garage level looking for the vehicle; at this time, Kain was noticeably shaking and hesitant to answer simple questions about the Chrysler 300's location.

6. Detectives and officers noted as suspicious Kain's apparent inability to locate the Chrysler 300 he had arrived in, and his repeated checks of the same area in the same rental car garage. Nevertheless, detectives and officers continued searching for the Chrysler 300, and then located the vehicle in Garage Level B. Detectives explained that the location where they found the vehicle was not in the rental car garage area.

7.     Meanwhile, Kain stopped looking for the vehicle, sat down on a curb, and appeared extremely anxious. Kain was shaking and visibly sweating. Kain repeatedly rubbed his hands together, on his pants, and on his face. Det. Dower advised Kain that he was not under arrest, and then Mirandized Kain using his department issued Miranda card. Det. Dower then asked Kain why was he so nervous. Kain was unresponsive. Det. Dower asked Kain what was inside the Chrysler 300. Kain stated that nothing was inside the car. Det. Dower told Kain that the Chrysler 300 would be located and police would learn what was in it, and asked Kain to be honest regarding the Chrysler 300's contents. Kain repeated that nothing was inside of the Chrysler 300.

8.     A short time later, officers notified Det. Dower that they found the Chrysler 300, and that the vehicle contained bags. Det. Dower asked Kain if he had any bags in the Chrysler 300. Kain stated that yes; he had multiple bags and luggage in the vehicle. Det. Dower asked why Kain had luggage in the vehicle, and if Kain was planning to travel somewhere. Kain explained that although he lived in Winchester, he was staying with a friend in Arlington (Arlington, Virginia), and that was why Kain had bags in the vehicle. Kain stated that the bags contained his toiletries, clothes, and personal items. Det. Dower asked Kain how many bags in total were in the car. Kain then made seemingly conflicting statements. First, Kain claimed that a couple of the bags belonged to Berg. Det. Dower asked Kain how many bags in total were in the Chrysler 300. Kain responded and said that three of the bags belonged to Berg. Det. Dower asked Kain how many bags were in the Chrysler 300. Kain then stated that three bags were Berg's and one small bag was his, for a total of four bags. Det. Dower asked what was in the bags. Kain stated that he did not know what was in the bags.

9. Detectives informed Kain that the Chrysler 300 had been located, and that it had been seized by police to be returned to Enterprise. Detectives and officers informed Kain that he could retrieve his property from the vehicle after police had completed an inventory. However, Kain declined to retrieve any of his property, and asked the officers if he could depart the area. The officers told Kain he was free to leave, and Kain then left the area without his property.

10. Detectives and officers proceeded to the Chrysler 300's location. At this time, it was evening and dark outside. Detectives opened the Chrysler 300 and immediately observed in the front passenger area of the vehicle a small blow torch (similar to a lighter) and a belt that had been looped through itself, as though it had been used as a tourniquet. Detectives opened the center console of the Chrysler 300 and discovered a clear crystalline material that appeared to be crystal methamphetamine, based upon training and experience. Officers also observed in the vehicle what appeared to be hypodermic needles. Due to the safety concerns presented by the small space of vehicle, the poor visibility of the late hour, and the lack of an available evidence technician to properly process the vehicle, detectives decided to secure the Chrysler 300 overnight at the MWAA police impound lot, and continue the search of the vehicle the following day.

11. On April 5, 2017 MWAA Detectives contacted agents and officers of DEA Airport Group 11 for assistance, who then responded to MWAA's impound lot. Amtrak Officer Winston brought to the vehicle his drug certified canine "Koda", who did alert to the presence of narcotics inside of the middle console of the Chrysler 300 and on a bag located inside of the trunk of the Chrysler 300. A short time later, MWAA's evidence technician, Corporal Joyce Pearson responded to MWAA's impound area to process the Chrysler 300.

12. Detectives directed agents and officers to the middle console of the Chrysler 300, where they had observed the crystalline shard substance the prior evening. SA Webb, witnessed by detectives, conducted a field test on the substance using a Narcotest field-testing kit for methamphetamine. The substance tested positive for methamphetamine. Inside of the Chrysler 300's trunk, detectives observed multiple luggage bags and shoulder bags. Inside of a green and blue shoulder bag, detectives observed an opened envelope that contained a zip lock bag, which held a large amount of a crystalline substance; officers estimated the zip lock bag contained approximately one pound of methamphetamine, based upon their training and experience. SA Webb, witnessed by detectives, conducted a field test on the substance in the zip lock bag using a Narcotest field-testing kit for methamphetamine. The substance tested positive for methamphetamine.

13. Throughout the search of the Chrysler 300, detectives, officers and agents located a variety of additional items, including but not limited to: smaller baggies containing a crystalline substance believed to be methamphetamine, used and unused syringes (some containing liquid substances), a digital scale, and packaging material (paraphernalia) of the type commonly used to package smaller quantities of methamphetamine for sale. Detectives and agents also located in the vehicle Wells Fargo Bank, AT&T, Geico and Credit One bills containing the name Christopher Kain of 116 Forrest Drive, Winchester, VA 22603. Detectives also located in the vehicle a copy of the car rental agreement for the Chrysler 300, which showed that Kain was the lessee with the address 116 Forrest Drive, Winchester, VA 22603.

14. Agents and officers also conducted research using law enforcement databases, which revealed that in September 2016, a DEA confidential source (CS) had identified Kain as a

distributor of methamphetamine in the Washington DC area. Agents at that time learned that Kain was living at 116 Forrest Drive, Winchester, VA 22603.

14. Based on my training, experience and participation in narcotic and drug-related investigations, and the training and experience of other agents and police officers with whom I have worked in this and other investigations, I am aware that:

    a. Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, etc. are often maintained where the dealers of illegal controlled substances have ready access to them, such as secured locations within their residence, the residences of friends and associates, in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated.

    b. Individuals who deal in illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, typically proceeds of illegal controlled substance transactions, in their residences and/or the residences of friends and associates, as well as their business locations, and/or in the places of operation of the drug distribution activity, such as a stash house or safe house,.

    c. It is common for individuals who deal in the sale of and distribution of illegal controlled substances to secrete contraband related to the illegal activity, such as scales, razors, packaging materials, cutting agents, bottles, jars, and other such

items at their residences, or the residences of friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

d. Individuals who deal in the sale and distribution of illegal controlled substances commonly maintain addresses and telephone number books or papers which reflect names, addresses, and/or telephone numbers for their associates and customers in their illegal drug organization. These individuals often utilize cellular telephones, pagers, and telephone systems to maintain contact with their associates in their illegal businesses. These telephone records, bills, and pager numbers are often found in their place of residence, or the residence of friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

e. Individuals who deal in illegal controlled substances often take photos of themselves, their associates, their property, and illegal contraband. These photos are sometimes maintained in their place of residence, or the residences of friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

f. Persons who traffic controlled substances maintain documents, letters, and records relating to illegal activity for long periods of time. This documentary evidence is usually secreted in their residence, or the residences of friends or associates, in their businesses, or in the places of operation of the drug distribution activity, such as a stash house or safe house. This documentary evidence includes but is not limited to, telephone numbers, telephone books,

address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.

g. Individuals involved in illegal narcotics trafficking often own, possess and/or use weapons as a means to facilitate their illegal drug activities. Such weapons are most often secreted in their residence, or the residences of friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

h. Individuals involved in illegal narcotics trafficking often own, possess and/or use multiple cellular phones to communicate with drug customers and/or distributors of illegal narcotics. Drug traffickers often store pertinent information on their cellular phones and often do not use their true identities as the subscriber information to thwart law enforcement.

i. Persons who traffic controlled substances often use rental vehicles to shield their identities from law enforcement. Furthermore, drug traffickers use rental vehicles with out-of-state license plates to travel long distances to re-supply themselves with illegal narcotics and protect their identity and personal vehicles from other drug traffickers.

15. Based on the facts set forth above, I believe that there is probable cause to believe that articles of the kind described in Attachment B — all of which may constitute evidence of the commission of violations of federal laws, including distribution of a controlled substance or conspiracy to distribute a controlled substance — will be found at the Forrest Drive Address.

## IV. CONCLUSION

WHEREFORE, I respectfully request that a search warrant be issued to allow agents to search the Forrest Drive Address, described in Attachment A, and seize any evidence of the kind described in Attachment B, which would be evidence of violations of 21 U.S.C. §§ 841 and 846.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 6th day of April, 2017.

_[signature]_
Special Agent Asia A. Webb
U.S. Drug Enforcement Administration

Received by reliable electronic means and sworn
and attested to by telephone on April 6, 2017.

~~Subscribed to and sworn before me this 6th day of April, 2017.~~

_[signature]_
JOEL C. HOPPE
United States Magistrate Judge

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

116 Forrest Drive, Winchester, Virginia 22603, can be described as a single story family duplex, with vinyl siding and brick, on the west side of Forrest Drive. The number "116" is in black on the left upper corner of the front door. The residence has a brown shingle roof with tan trimming. A driveway runs on the north side of this address to be searched. The residence has a white door facing Muse Drive.

## ATTACHMENT B

## ITEMS TO BE SEIZED

a. Documents showing addresses, names, phone numbers, email address, and telephone books and papers reflecting names, addresses, and telephone numbers.

b. Books, receipts, bank statements, and records, money drafts, ledgers of credit, money orders, and cashier's checks, receipts, passbooks, bank checks, and any other items evidencing the obtaining, secreting, transfer, and concealment, of assets in the obtaining, secreting, transfer, concealment and expenditure of money.

c. Documents related to rental cars and rental car agreements.

d. United States currency, precious metals, jewelry, and financial instruments, including but not limited to, stocks and bonds.

e. Photographs, in particular, photographs of suspected co-conspirators, assets, and controlled substances, and other documents, identifying possible associates and co-conspirators.

f. Paraphernalia commonly used for packaging, cutting, injecting, using, weighing and distributing methamphetamine or other illegal narcotics, including, but not limited to, scales, baggies, containers, jars, straws, razors, syringes, and tourniquets.

g. Indicia of occupancy, residency, and ownership of premises, including but not limited to, utility and telephone bills, canceled envelopes, and keys.

h. Any locked or closed containers that could contain any of the above listed evidence.

i. Cellular telephones (if seized, agents will not search cell phones before obtaining another search warrant authorizing the search of the seized phone(s)).